UNITED STATES *v.* WINCHESTER AND POTOMAC RAILROAD COMPANY.

APPEAL FROM THE COURT OF CLAIMS.

No. 195.   Argued March 31, April 1, 1896.—Decided May 18, 1896.

The Court of Claims had no jurisdiction over this case, as the claim of the defendant in error is a "War Claim," growing out of the appropriation of property by the army while engaged in the suppression of the rebellion.

THIS appeal brought up for review a judgment in favor of the Winchester and Potomac Railroad Company for the sum of thirty thousand three hundred and forty dollars, the value of certain iron rails removed in 1862 from the track of that railroad by the military authorities of the United States.

It seems necessary to a clear understanding of the questions presented that the history of this claim and the circumstances attending its prosecution against the United States should be fully stated.

In 1862 and for many years prior thereto the appellee, a corporation of Virginia, owned and operated the railroad extending from Harper's Ferry to Winchester in the State of Virginia. Its capital stock was largely owned by citizens of loyal States.

In March of that year the military authorities of the United States took possession of the road, which at the time was operated by the company for the use and benefit of the Confederate States in the transportation of troops, munitions of war, and other subjects under a contract made September 11, 1861, between an officer of the Confederate States Army and the president of the railroad company.

The possession of the United States covered substantially the whole time from March, 1862, to the 20th day of January, 1866, and during that period the Government had the exclusive use of the road for military purposes, receiving all tolls and revenues and applying the same to its benefit.

The United States, while in possession, repaired the road, and removed from it a quantity of strap rails and substituted T rails taken by it from the Manassas Gap Railroad Company. These T rails were upon the Winchester and Potomac Railroad up to the time possession was surrendered by the United States in 1866. The strap rails or iron so removed from the Winchester and Potomac Railroad were stored at Alexandria, Virginia.

The United States has never paid or accounted to the claimant for the revenues of its road which it collected and appropriated, nor for the rails so removed.

Immediately upon the restoration of the roads of the above companies to their respective owners, the Manassas Gap Railroad Company brought suit against the Winchester and Potomac Railroad Company for the iron taken from its own road and put upon the latter road, or its value, and obtained judgment, which was compromised in 1873 or 1874 by the payment by the Winchester and Potomac Railroad Company of $25,000.

The circumstances under which the appellee's road was surrendered by the United States are fully disclosed in the findings below, and, so far as pertinent to the present inquiry, may be thus summarized:

On the 19th day of May, 1865, the Quartermaster General submitted to the Secretary of War a scheme for the disposition of the railroads in the States then lately in rebellion. That scheme was as follows:

"1. The United States will, as soon as it can dispense with the military occupation and control of any road of which the Quartermaster's Department is now in charge, turn it over to the parties asking to receive it who may appear to have the best claim, and be able to operate it in such manner as to secure the speedy movement of all military stores and troops;

the Quartermaster General, upon the advice of the military commander of the department, to determine when this can be done, subject to the approval of the Secretary of War. 2. No charge to be made against the railroad for expense of material or expense of operation. 3. All materials for permanent way used in the repair and construction of the road, and all damaged material of this class which may be left along its route, having been thrown there during the operation of destruction or repair, to be considered as part of the road and given up with it. 4. No payment or credit to be given to the railroad for its occupation or use by the United States during the continuance of the military necessity which compelled the United States to take possession of it by capture from the public enemy. The recovery of the road from the public enemy and its return to loyal owners, and the vast expenditure of defence and repair, are a full equivalent and more than an equivalent for its use. 5. All movable property, including rolling stock of all kinds, the property of the United States, to be sold at auction, after full public notice, to the highest bidder. 6. All rolling stock and material, the property before the war of railroads, and captured by the forces of the United States, to be placed at the disposal of the roads which originally owned it, and to be given up to these roads as soon as it can be spared, and they appear by proper agents authorized to receive it. 7. When a State has a board of public works able and willing to take charge of its railroads, the railroads in the possession of the Quartermaster's Department to be given up to this board of public works, leaving it to the state authorities and the judicial tribunals to regulate all questions of property between said boards, agents or stockholders. 8. Roads not being operated by the United States Quartermaster's Department not to be interfered with unless under military necessity. Such roads to be left in possession of such persons as may now have possession, subject only to the removal of every agent, director, president, superintendent or operator who has not taken the oath of allegiance to the United States, which rule should be rigidly enforced. 9. When the superintendents in actual possession decline to take·

such oath, some competent person to be appointed as receiver of the railroad, who shall administer the affairs of the road and account for its receipts to the board of directors who may be formally recognized as the legal and loyal board of managers. This receiver to be appointed, as in the case of other abandoned property, by the Treasury Department. . . ."

The Secretary of War approved that scheme, and the Quartermaster General was directed to turn over the roads.

Certain regulations were established by the War Department, and promulgated August 8, 1865, and October 14, 1865, for the guidance of the military authorities in relinquishing the control of railroads in the occupancy of the United States.

In reply to an oral application made November 16, 1865, by the Winchester and Potomac Railroad Company to have its road restored upon the terms accorded to other companies, the matter was referred by the Secretary of War to the Quartermaster General for such arrangement and recommendation as he deemed proper. The Quartermaster General recommended that the application be granted, and the officer in charge of military roads was directed to surrender possession — "all rolling stock and railroad materials upon that road, which the company may not elect to purchase, to be sold, as soon as preparation can be made, at public auction."

This order not having been immediately executed, the president of the Winchester and Potomac Railroad Company, December 5, 1865, made a request in writing that his company's road be delivered up to its board of directors. Thereupon, on the 15th of December, 1865, an order for the surrender of the road was issued. That order was executed by the delivering the road, on the 16th day of January, 1866, to the Baltimore and Ohio Railroad Company, as lessees of the Winchester and Potomac Railroad Company.

The facts in relation to the disposition of the iron removed by the military authorities of the United States from the Winchester and Potomac Railroad and stored at Alexandria are as follows:

On the same day on which the president of the Winchester

and Potomac Railroad Company made verbal application for the restoration of the road to his company, he addressed to the director and general manager of military railroads a communication in which he said: "We are informed that a quantity of the iron from our road — flat or strap bar — is now in possession of your department at Alexandria, Va., which we are anxious to recover, as we hope the road is about to be returned to the company. We respectfully request that the fact may be inquired into, and, if proper, an order made to return the said iron to my order, as president of the company."

No answer was returned to this application, nor were any affidavits or other proof of the ownership or value of the iron mentioned, nor of any of the other facts therein alleged, offered to or filed in any Executive Department, prior to May 11, 1885, on which day the Baltimore and Ohio Railroad Company made a written application, to which reference will be presently made. But at or about the date of the above communication of November 16, 1865, the president of the Winchester and Potomac Railroad Company made an application to the Quartermaster General for this iron.

A large quantity of iron, stored at Alexandria and in the possession of the United States, and aggregating more than $2,000,000 in value, was sold at public auction on December 13, 1865. The iron taken in 1862 from the appellee's road was part of the iron so disposed of. It sold for $30,340, and was paid for January 9, 1866, the proceeds being used, through the War Department, for the benefit of the United States.

On the 2d day of December, 1875, the president of the Baltimore and Ohio Railroad Company addressed to the Quartermaster General a communication, saying: "Subsequent to the termination of the late war the United States military railroad authorities sold a quantity of old rails in Alexandria, Va., which had been taken from the line of the Winchester and Potomac Railroad. I have the honor to request that you will furnish me with the dates the said rails were sold, the quantity sold, the price per ton, the amount realized from the sale of the rails taken from the line of the Winchester and Potomac Railroad, and the disposition made by the U. S. M. R. R'd

managers of the proceeds.   You will further oblige me by stating the date on which the Winchester and Potomac Railroad was surrendered by the War Department to its owners."

The Quartermaster General replied, under date of December 11, 1875, giving him exact information touching all the matters about which inquiry was made.

Nothing seems to have been done by the claimant or by any one in its name, until May 11, 1885, when the Baltimore and Ohio Railroad Company, by its president, made to the Quartermaster General a written application or claim for the proceeds of the sale of said iron, as follows:

"*The United States to the Baltimore and Ohio Railroad Company, lessee of the Winchester and Potomac Railroad Company, Dr.*

"For 507 tons 1940 pounds (2240 pounds to the ton) of iron rails appertaining to the Winchester and Potomac Railroad Company, and the property of that company, which once formed a part of its superstructure when taken by the United States authorities, and was subsequently sent to Alexandria, Va., and sold at auction by the United States Military Railroad Department in December, 1865, for the sum of $30,340."

This application was forwarded to the Secretary of War, and was by him returned to the Quartermaster General.   The latter officer made an elaborate report, under date of December 7, 1885, in which, among other things, he said: "The only reason which can be given for the failure of the company to secure possession of its old iron is the fact that the company was not in condition to receive it before its sale.   If the transfer of the road to the Winchester and Potomac Railroad Company had been authorized and effected before the sale of the iron it is believed that the company would have been permitted to take possession of it.   A denial of this privilege or right would have involved an unjust discrimination by the Government between the treatment of this company and that of all other companies whose roads were used for military purposes during the war, and would have been a marked departure from the policy and practice of the Government toward such companies upon the restoration of their roads.   .   .   .

But it is not believed to be in the power of the Executive Department to afford relief at this time without the intervention of Congress. . . . It is, therefore, respectfully recommended, if this report be approved, that this claim, with the papers accompanying it, be referred to the Third Auditor for adjudication by the accounting officers of the Treasury, with recommendation for such action as the law and facts of the case require."

The Secretary of War approved this report, and " the accompanying papers in the claim of the Baltimore and Ohio Railroad Company for the proceeds of railroad iron, stated by the company at $30,340," were " referred (through the office of the Quartermaster General) to the Third Auditor of the Treasury for settlement from the appropriation ' Transportation of the Army and its supplies,' the amount found due to be reported to Congress for appropriation."

On the 4th day of March 1887 the Third Auditor reported against the claim, but without expressing an opinion on its merits if such claim should ever be presented by the Winchester and Potomac Railroad Company.

Thereupon the Winchester and Potomac Railroad Company was substituted as claimant in interest in place of the Baltimore and Ohio Railroad Company, its lessee, claiming on its behalf.

On the 18th day of April, 1887, the Third Auditor again recommended the disallowance of the claim and certified the matter to the Second Comptroller of the Treasury.

The Second Comptroller, March 9, 1889, sent the claim, with accompanying papers, to the Secretary of the Treasury as one involving disputed facts and controverted questions of law, with a recommendation that the case, vouchers, etc., be transmitted to the Court of Claims for trial and adjudication. The Secretary, March 12, 1889, sent the claim, with the papers, to the Court of Claims, under section 1063 of the Revised Statutes, for trial and adjudication, expressing, however, doubt whether the Department had jurisdiction of it, but submitting that question to that court for its determination.

*Mr. Assistant Attorney General Dickinson* for appellant.

*Mr. Frank P. Clark* for appellee.

The whole argument of the appellant is based upon the assumption that this claim is a "War Claim."

It is nothing of the kind; it is a claim founded upon a contract, and one entered into after the war had ended.

I venture the proposition that were the United States to *make a contract,* express or implied, with an enemy in arms, the Court of Claims would have jurisdiction of a case instituted to recover damages for its breach.

In the *Sinking Fund cases,* 99 U. S. 700, 719, this court, speaking through its late lamented Chief Justice, have said: "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen."

Can there be any question, as between individuals, that the same state of facts as have been certified up to this court in this case would be held by any court to constitute a contract for the breach of which either party thereto would be entitled to damages, and that the amount of damages would be the value of the iron ?

MR. JUSTICE HARLAN, after stating the case as above, delivered the opinion of the court.

The United States contends that the claim in question is not one of which the Court of Claims could take cognizance for purposes of final adjudication; that the case is not one of implied contract; and that the Government is protected from any judgment against it by the statutory limitation of six years. The first of these questions does not seem to have been raised in the court below.

The act of February 24, 1855, c. 122, by which the Court of Claims was constituted, gave it jurisdiction to hear and determine all claims against the United States " founded upon

any law of Congress, or upon any regulation of an Executive Department, or upon any contract, express or implied, with the Government of the United States." 10 Stat. 612. But by a subsequent act passed July 4, 1864, c. 240, it was declared "that the jurisdiction of the Court of Claims shall not extend to or include any claim against the United States growing out of the destruction or appropriation of, or damage to, property by the army or navy, or any part of the army or navy, engaged in the suppression of the rebellion, from the commencement to the close thereof." 13 Stat. 381.

By the act of February 21, 1867, c. 57, it was provided that the act of 1864 should "not be construed to authorize the settlement of any claim for supplies or stores taken or furnished for the use of, or used by the armies of the United States, nor for the occupation of, or injury to, real estate, nor for the consumption, appropriation or destruction of, or damage to, personal property, by the military authorities or troops of the United States, where such claim originated during the war for the suppression of the Southern rebellion, in a State, or part of a State, declared in insurrection." 14 Stat. 397.

The Revised Statutes omitted the provisions of the acts of 1864 and 1867. Whether that omission was intentional or not, we need not inquire; for, by the act of February 18, 1875, c. 80, which was passed to correct errors and supply omissions in the Revised Statutes, section 1059, enumerating the matters or cases of which the Court of Claims could take cognizance, was amended by adding to its fourth paragraph the following additional proviso: "*Provided, also,* That the jurisdiction of the Court of Claims shall not extend to any claim against the United States growing out of the destruction or appropriation of, or damage to, property by the army or navy engaged in the suppression of the rebellion." 18 Stat. 318.

The Tucker act of March 3, 1887, c. 859, expressly withholds from the Court of Claims, and from the District and Circuit Courts of the United States, "jurisdiction to hear and determine claims growing out of the late civil war, and commonly known as 'War Claims.'" 24 Stat. 505.

It thus appears that at the time the appellee, by its president, made application to the military authorities to have its road, as well as the iron rails in question, restored to its possession, the Court of Claims was without authority to adjudicate any claim against the United States "growing out of" the destruction or "appropriation" of or damage to property by the army or navy engaged in the suppression of the rebellion; further, that at the time the appellee's claim was transmitted by the Secretary of the Treasury to the Court of Claims for adjudication that court was without jurisdiction to hear and determine claims "growing out of the late civil war and commonly known as 'War Claims.'" Of course, the "War Claims" to which the act of 1887 referred included those described in the previous acts as claims growing out of the destruction or appropriation or damage to property by the army or navy engaged in the suppression of the rebellion.

Is the claim of the appellee a "War Claim" within the meaning of the act of 1887? Light will be thrown upon this question by the decisions construing the act of 1864, which excluded from the jurisdiction of the Court of Claims any claim "growing out of" the destruction or "appropriation" of property, by the army or navy engaged in the suppression of the rebellion.

In *Filor* v. *United States*, 9 Wall. 45, 48, 49, it appeared that a certain wharf and its appurtenances at Key West, Florida, were in the use and occupation of the United States during the civil war under an agreement as to rental between an acting assistant quartermaster, stationed at that place, and the owner of the property, but the agreement was not approved by the Quartermaster General. This court said: "No lease of the premises for the use of the Quartermaster's Department, or any branch of it, could be binding upon the Government until approved by the Quartermaster General. Until such approval the action of the officers at Key West was as ineffectual to fix any liability upon the Government as if they had been entirely disconnected from the public service. The agreement or lease was, so far as the Government is concerned, the work of strangers. The obligation

of the Government for the use of the property is exactly what it would have been if the possession had been taken and held without the existence of the agreement. Any obligation of that character cannot be considered by the Court of Claims." Referring to the provisions of the above act of July 4, 1864, the court proceeded: "The premises of the petitioners were thus appropriated by a portion of the army. It matters not that the petitioners, supposing that the officers at Key West could bind the Government to pay a stipulated rent for the premises, consented to such appropriation. The manner of the appropriation, whether made by force or upon the consent of the owner, does not affect the question of jurisdiction. The consideration of *any* claim, whatever its character, growing out of such appropriation is excluded. The term appropriation is of the broadest import; it includes all taking and use of property by the army and navy, in the course of the war, not authorized by contract with the Government. . . . If the petitioners are entitled to compensation for the use of the property they must seek it from Congress."

The case of *United States* v. *Russell*, 13 Wall. 623, 632, was somewhat different in its facts. That was a suit to recover for the use of certain steamboats used in the public service by the military authorities at St. Louis, Missouri, in 1863. It appeared from the findings of the Court of Claims that the military officers did not intend to "appropriate" the steamboats to the United States, nor even their services, although they did intend to compel the masters and crews, with the steamers, to perform the services needed, and that the United States should pay a reasonable compensation for such services; that such was the understanding of the owner; and that the steamers, as soon as the services for which they were required had been performed, were returned to the exclusive possession and control of the owner. The steamers were equipped, victualled and manned by the owner, and he, or persons by him appointed, continued in their command throughout the entire period of the service. "He yielded at once," this court said, "to the military order, and entered into the service of

the Government, and the court here fully concur with the Court of Claims that there was not such an appropriation of the steamboats or of the services of the masters and crews as prohibited the court below from taking jurisdiction of the case.   On the contrary, the court is of the opinion that the findings of the Court of Claims show that the employment and use of the steamboats were such as raise an implied promise on the part of the United States to reimburse the owner for the services rendered and the expenses incurred, as allowed by the Court of Claims.   Valuable services, it is conceded, were rendered by the appellee, and it is not pretended that the amount allowed is excessive.   Neither of the steamers was destroyed, nor is anything claimed as damages, and inasmuch as the findings show that an appropriation of the steamers was not intended, and that both parties understood that a reasonable compensation for the services was to be paid by the United States, the court is of the opinion that the objection to the jurisdiction of the Court of Claims cannot be sustained, as the claim is not for 'the destruction or appropriation of or damage to property by the army or navy engaged in the suppression of the rebellion.' "

Another case is that of *Pugh* v. *United States*, 13 Wall. 633, 634, 635.   In the petition in that case the claimant averred "that the United States, during the late civil war, illegally, violently and forcibly took possession of his plantation, in the State of Louisiana, on the false pretext that it had been abandoned by the owner, and held it until January, 1866, during which time the United States, and the agents placed in charge of the plantation, destroyed and carried away the property of the petitioner to the value of $42,508; and that the United States, during the same period, rented the plantation to sundry persons, who made large ciops, worth $15,000 or $30,000."   Chief Justice Chase, speaking for the court, said: "The destruction of the property complained of was during the war and in one of the States engaged in the rebellion, and the presumption, in the absence of inconsistent allegations, is that it was by the military forces of the United States.   It is clear that a petition for compensation for injuries of this character

could not be sustained in the Court of Claims, for the demand plainly grows "out of the destruction or appropriation of or damage to property by the army or navy engaged in the suppression of the rebellion,' and is excluded from the cognizance of that court by the express terms of the act of July 4, 1864. . . . It is plain, therefore, that the petition does not state a case within the jurisdiction of the Court of Claims. If the petitioner has any claim upon the Government he must seek relief from Congress."

The present case is controlled by the decisions in *Filor* v. *United States* and *Pugh* v. *United States*. It is not a case, like that of *United States* v. *Russell*, of the use of property under a valid implied agreement that the owner should be compensated; but is one of the actual appropriation by the military authorities of the United States, engaged in the suppression of the rebellion, of property which, at the time of such appropriation, was being employed by the Confederate Government in hostility to the Union. The transaction had no element of contract, but was wholly military in character. In *Russell's case*, the owner of the property acquiesced in its use by the Government, and there was such an understanding between the Government and himself as made it, in the opinion of this court, the duty of the former under the Constitution to make just compensation to the latter. In the case now before us, the road and its appurtenances were seized without regard to the assent of the owner and without any understanding that compensation was to be made. Indeed, it would not have been competent for the military authorities of the United States to have bound the Government to make compensation to the appellee for the use or for the return of property which, when seized, was being actively employed, under a contract with its owner, to advance the cause of the rebellion. If the appellee's road and the iron upon it were not, under the circumstances which attended their seizure, "appropriated" by the military authorities engaged in the suppression of the rebellion, it is difficult to conceive of a case of an appropriation of property within the meaning of the acts of 1864 and 1875. The road and its appurtenances hav-

ing been thus seized and appropriated, for military purposes, during the war, what was done by the military authorities of the United States is to be regarded as an act of war, and the claim of the appellee, for the proceeds of the property appropriated, must be deemed a "War Claim" within the meaning of the act of 1887, and, therefore, expressly excluded from the jurisdiction of the Court of Claims at the time it was transmitted to that court for adjudication. Jurisdiction could not attach by reason simply of the claim having been certified to that court by an Executive Department under section 1063, as one involving controverted questions of fact and law; for, in *United States* v. *New York*, 160 U. S. 598, 615, the various statutes relating to the jurisdiction of the Court of Claims were examined, and it was held, upon full consideration, that notwithstanding the passage of the Bowman and Tucker acts, a claim described in section 1063 of the Revised Statutes could be transmitted to the Court of Claims for "final adjudication," provided "such claim be not barred by limitation, and be one of which, by reason of its subject-matter and character, that court could take judicial cognizance at the voluntary suit of the claimant."

The appellee insists that its claim is not a "War Claim," but is one founded upon contract made after the civil war ended. But in whatever light the matter be viewed, and even if it were held that the military authorities of the United States, after actual hostilities ceased, agreed to return the iron in question to the appellee, its claim is one "growing out of" the appropriation of property by the army engaged in the suppression of the rebellion, and therefore a "War Claim" within the meaning of the above act of March 3, 1887. It could not be divested of that character by anything done or omitted to be done by any officer or Department of the Government. After the suppression of the rebellion the military authorities had no such relations to property appropriated by them during the war as enabled them, by contract or otherwise, to turn a claim growing out of such appropriation into a claim based upon contract, and thereby give to the Court of Claims a jurisdiction denied to it by Congress. We do not

mean to say that this claim might not have been allowed by the proper Executive Department, and paid out of moneys at its disposal for such purposes. No such question is now presented, and we therefore express no opinion upon it. We adjudge nothing more than that the Court of Claims could not take judicial cognizance of this claim because it was and is a "War Claim," that is, one growing out of the appropriation of property by the army while engaged in the suppression of the rebellion, and not one arising upon a valid contract, express or implied, made when such appropriation occurred.

These views render it unnecessary to consider any other question in the case, and require a reversal of the judgment.

*The judgment is reversed and the cause remanded with directions to dismiss the action for want of jurisdiction in the Court of Claims.*

MR. JUSTICE SHIRAS dissented.