**UNITED STATES of America, et al., Plaintiffs,**

v.

**SHELL OIL CO., et al., Defendants.**

**And Related Claims.**

**No. CV 91–0589–RJK.**

United States District Court, C.D. California.

Sept. 28, 1993.

---

William A. Weinischke and Kathryn Schmidt, Trial Attys., U.S. Dept. of Justice, Environment and Natural Resources Div., Environmental Enforcement Section, Gregory A. Ritter, Asst. Regional Counsel, U.S. E.P.A., Region 9, Washington, DC, for plaintiff U.S.

Timothy R. Patterson, Deputy Atty. Gen., CA Dept. of Justice, San Diego, CA, for plaintiff State of CA.

Peter R. Taft, Munger, Tolles & Olson, Los Angeles, CA, Cynthia Burch, Patrick E. Breen, Allen, Matkins, Leck, Gamble & Mallory, Irvine, CA, for defendants Shell, Union, ARCO and Texaco.

Jeffrey Z.B. Springer, Demetriou, Del Guercio & Springer & Moyer, Los Angeles, CA, for defendant McCauley LCX Corp.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

In this action, the governments of the United States and the State of California (collectively "the governments") seek to recover costs incurred, and declaratory relief as to liability for costs yet to be incurred, in responding to the presence of hazardous wastes at a site in Fullerton, California known as the McColl Site ("the Site"). Recovery of response costs is sought pursuant to section 107(a) of the Comprehensive Environmental Response, Compensation, and Lia-

bility Act of 1980 ("CERCLA"), Pub.L. No. 96–510, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. 99–499, codified at 42 U.S.C. § 9607(a). Declaratory relief is sought pursuant to CERCLA section 113(g)(2), codified at 42 U.S.C. § 9613(g)(2).

The governments seek recovery from: Shell Oil Company ("Shell"), Union Oil Company of California ("Union" or "Unocal"), Atlantic Richfield Company ("Arco" or "Richfield"), and Texaco, Inc. ("Texaco") (collectively "the oil companies") and McAuley LCX Corporation ("McAuley").[1] The oil companies are charged as successors in interest to the corporations that generated the hazardous wastes and arranged for their disposal at the McColl Site. McAuley is charged as an owner or operator of part of the McColl Site.

The governments move the Court for partial summary judgment as to Defendants' liability for response costs at the McColl Site under section 107 of CERCLA.[2] The parties also have filed opposing motions for bifurcation and trifurcation of various phases of this litigation. These relate to the order in which the governments' cost recovery phase and the Defendants' counterclaims and cross-claims are resolved. By this Memorandum of Decision and Order the Court disposes of all these pending matters.

## BACKGROUND

The McColl Superfund Site comprises roughly twenty-two acres in Fullerton. It is bordered by housing developments, a country club golf course, a regional park, and an oil field. The Site is divided into two distinct areas: the Ramparts area and the Los Coyotes area. The Ramparts area occupies vacant land. It contains six large pits, or sumps. The Los Coyotes area is land that once was part of the Los Coyotes Country Club golf course. It contains six sumps which underlie what were portions of the golf course.

The hazardous waste located at the McColl Site consists of acid sludge byproducts of alkylation processes used by the oil companies during World War II to produce high octane aviation fuel. During the war, the oil companies produced this aviation fuel in extraordinary quantities at the demand of, and in fulfillment of supply contracts with, the federal government.

The oil companies have submitted many thousands of pages of deposition testimony and documentary evidence to illustrate the degree of oversight exercised by the federal government over the oil companies' production of this aviation fuel. A clear picture emerges from this evidence of the backdrop of federal governance over the oil companies during the war. In addition, the Court possesses considerable first-hand familiarity with the manner in which the government regulated industry during the war.

As part of the United States' war effort during World War II, the federal government implemented a regulatory regime under which all industries were required to cooperate with the government in providing the necessary armaments and supplies to support our fighting forces. Not unlike other industrial sectors, the petroleum industry was subject during the war to pervasive oversight by agencies of the federal government. Under the wartime regulatory regime, an oil company that refused to cooperate with the federal government would have been subject to government takeover. And individuals who interfered with the government's regulation of industry and acquisition of supplies would have been subject to criminal prosecution.

Notwithstanding the government's intrusive regulatory power over the oil companies during the war, it is beyond dispute that the

---

**1.** The governments originally named Ramparts Research & Financial Corporation ("Ramparts"); and Los Coyotes Estates, Ltd. ("Los Coyotes") as defendants as well. There is no indication in the record that either Ramparts or Los Coyotes was ever served, and neither has appeared in the case. On March 11, 1993, the governments voluntarily dismissed their claims against Ramparts and Los Coyotes. On March 15, 1993, the oil companies voluntarily dismissed their cross-claims against LCE and Ramparts. Thus, Ramparts and Los Coyotes are no longer defendants in this action.

**2.** The governments filed separate parallel motions for summary judgment as to the liability of the oil companies and McAuley.

oil companies entered into their contracts to supply the federal government with aviation fuel volitionally. In what measure the oil companies' willingness to enter into these supply contracts was due to a sense of civic duty, as opposed to the evident profitability of the contracts, is impossible to determine and immaterial to the issues presently before the Court.

During the war the government's constantly growing demand for aviation fuel became so great the oil companies were hard pressed to meet that demand. As a byproduct of the enormous volume of fuel produced, the oil companies were confronted with quantities of acid sludge waste too great to be treated or disposed of in their existing facilities. The government urged the oil companies not to allow the accumulation of this waste to interfere with the production of aviation fuel. With at least tacit approval from the government, the oil companies disposed of their waste problem by contracting with Eli McColl to transport the acid sludge away from their refining facilities and dispose of it by dumping it in the unlined pits, or "sumps," on the plot of land in Fullerton now referred to as the McColl Site. Although the government was aware, and in some measure approved, of the oil companies' disposal of the acid sludge, the choice to arrange for waste disposal in the manner described was made by the oil companies.

The dumping of acid sludge at the McColl Site ceased shortly after the end of World War II. In the 1950s, the City of Fullerton requested that McColl fill in the acid sludge-filled sumps in preparation for residential development in the immediate vicinity of the Site. McColl requested and received assistance from the oil companies, who acknowledged their responsibility for the presence of the acid sludge in those sumps.

Some time after the sumps had been covered over, the Los Coyotes Country Club was built and part of the Site was developed into a portion of the club's golf course. McAuley subsequently purchased the club, which it has owned and operated for over a decade. Prior to purchasing the club, McAuley was made aware of the presence of the sumps beneath the golf course and commis-

sioned an environmental assessment in late 1980, shortly before purchasing the club.

For over a decade, the acid sludge at the McColl Site has been oozing up through the surface of the ground. There are approximately 100,000 cubic yards of waste and contaminated soils at the Site. The waste at the Site includes benzene, toluene, xylene, arsenic, sulfur dioxide, hydrogen sulfide, and tetrahydrothiopene.

## STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact. Fed.R.Civ.P. 56(c); *Federal Deposit Ins. Corp. v. O'Melveny & Myers,* 969 F.2d 744, 747 (9th Cir.1992) (citing *Gizoni v. Southwest Marine, Inc.,* 909 F.2d 385, 387 (9th Cir.1990), *aff'd,* — U.S. ——, 112 S.Ct. 486, 116 L.Ed.2d 405 (1991)). Summary judgment is appropriate whenever the pleadings and evidence establish that there are no genuine issues as to any material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Manzanita Park v. Insurance Co. of North America,* 857 F.2d 549 (9th Cir.1988). Thus, summary judgment should be granted so long as the evidence before the court demonstrates that after adequate time for discovery, there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986).

There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a "reasonable jury" to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Evidence that is merely colorable or that is not "significantly probative" does not raise a genuine issue of material fact and the mere possibility that the nonmoving party may discredit the moving party's testimony at trial will not suffice to defeat a properly presented motion. *United Steelworkers of America v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989) (en banc) (citing

*Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11).

Courts have readily granted summary judgment as to various issues, including liability, in the context of potentially intractable CERCLA cases. *E.g., Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir. 1989); *United States v. Stringfellow,* 661 F.Supp. 1053, 1058 (C.D.Cal.1987).

### DISCUSSION

■ In order to establish liability for response costs pursuant to section 107 of CERCLA, the governments must establish four elements: (1) the McColl site is a "facility"; (2) a "release" or "threatened release" of a "hazardous substance" from the site has occurred; (3) the release or threatened release has caused the governments to incur response costs; and (4) the defendants fall within at least one of the four classes of covered persons.

CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed." *3550 Stevens Creek Assocs. v. Barclays Bank of California,* 915 F.2d 1355, 1357 (9th Cir. 1990).

Section 107(a) provides in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection

(b) of this section—

(1) the owner and operator of a ... facility,

. . . .

(3) any person who ... arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, ...

. . . .

... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States or a State ... not inconsistent with the national contingency plan....

42 U.S.C. § 9607.

■ Congress intended that responsible parties, not the general citizenry, "bear the costs of protecting the public from hazards produced in the past by a generator, transporter, consumer, or dumpsite owner or operator...." Senate Comm. on Environment and Public Works, S.Rep. No. 848, 96th Cong., 2d Sess. 98, (1980) *reprinted in,* 1 CERCLA Leg.Hist. at 405 (1980). And Congress intended to make parties covered by section 107(a) strictly liable, in that no showing of fault is required, for response costs, subject only to the limited affirmative defenses set forth in section 107(b). *New York v. Shore Realty,* 759 F.2d 1032, 1042 (2d Cir. 1985) (citing 126 Cong.Rec. 30,932 (statement of Sen. Randolph)).

■ Among responsible parties, that is all parties covered by the four classes, liability is joint and several. *E.g., United States v. American Cynamid Co.,* 786 F.Supp. 152, 164 (D.R.I.1992); *United States v. Stringfellow,* 661 F.Supp. 1053, 1060 (C.D.Cal.1987); *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 811 (S.D.Ohio 1983), *cited with approval in* House Committee on Energy & Commerce, H.Rep. No. 253, 99th Cong., 2nd Sess. Pt. 1, at 74 (1985) 1986 U.S.Code Cong. & Admin.News pp. 2835, 2856.

■ The Court construes CERCLA's liability provisions liberally with a view toward facilitating the statute's broad remedial goals. *Kaiser Aluminum & Chemical Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1340 (9th Cir.1992); *Wickland Oil Terminals v. ASARCO, Inc.,* 792 F.2d 887, 892 (9th Cir. 1986).

### A. The McColl Site is a Facility under Section 101(9)

■ Under section 101(9) of CERCLA "facility," as used in CERCLA, includes within its meaning "any ... well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, ... or ... any site or area where a hazardous substance has been deposited,

stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9). An area or site is a facility within the meaning of CERCLA if a hazardous substance is placed there or has otherwise come to be located there. *3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355, 1360 (9th Cir.1990), *cert. denied* — U.S. —, 111 S.Ct. 2014, 114 L.Ed.2d 101.

■ An affidavit attesting to the presence at a site of hazardous substances including toluene and xylene is sufficient to establish that the site is a "facility" for CERCLA purposes. *United States v. Hardage*, 761 F.Supp. 1501 (W.D.Okl.1990).

■ The waste in the pits is characterized by low pH, high sulfur and high organic content. Among other arguably hazardous substances contained in the waste at the McColl site are benzene, toluene and xylene. Declaration of John Blevins at 5, Exhibit 10 at 186. It is beyond dispute that at least these three substances are hazardous substances under CERCLA. *See* 40 C.F.R. § 261.33(e)–(g) (1992). The listing of a substance as hazardous, not its concentration or amount, controls the identification of hazardous substances under CERCLA. *City of New York v. Exxon Corp.*, 744 F.Supp. 474 (S.D.N.Y.1990).

Thus, there can be no dispute that the so-called sumps filled with acid sludge on the McColl Site contain hazardous substances and so constitute a facility under section 101(9).

Thus, the Court concludes the McColl Site is a facility for purposes of section 107 liability.

## B. Release or Threatened Release of Hazardous Substances at the McColl Site

■ Arguably, the dumping of the acid sludge into the unlined pits on the McColl Site itself constitutes a release within the meaning of section 101(22). But the Court need not reach that issue. Since at least 1980, when the EPA became involved in the site, the acid sludge—a black, viscous, tar-like material—has been seeping up through the soil cover to the surface. Blevins Declaration at 5, Exhibit 10 at 186; Deposition of John Blevins at 74–75, 98–101, 102–04, Exhibit 11 at 193–94, 200–03, 204–06; *see also* Exhibit A of Blevins Declaration, Exhibit 10 at 190–91 (color reproductions of photographs showing lava-like flows of the sludge at various places on the McColl site, some quite close to residences). These seeps clearly are releases into the environment, and the fact that they continue to occur presents an ongoing threat of further release of hazardous substances into the environment.

In addition, once the sludge breaks the ground surface benzene, toluene, xylene, and hydrogen sulfide are released into the atmosphere—another release of hazardous substances into the environment.

Finally, there is some evidence that substances in the acid sludge deposited at the McColl Site may have migrated into groundwater 230 feet below the surface. The fact that the sludge was dumped into unlined pits, the shown tendency of the sludge to migrate through strata of soil, and the detection of volatile substances known to be present in the sludge in groundwater are sufficient to establish at least a threatened release of hazardous substances into the groundwater.

In light of this showing, the Court concludes that there is no genuine dispute regarding the fact that releases of hazardous substances from the McColl Site have occurred and a continuing threat of further releases exists.

## C. Governments' Costs in Responding to the Release or Threatened Release of Hazardous Substances at the McColl Site

Defendants do not dispute, and the record manifests beyond dispute, that the governments have incurred response costs at the McColl Site within the meaning of section 107(a).

## D. Defendants' Status as "Covered Persons" Under Section 107(a)

■ The record before the Court establishes beyond dispute that the oil companies

generated the hazardous waste dumped at the McColl Site, and that they contracted with Eli McColl to transport the waste to, and dump it in the sumps on, the McColl Site. Consequently, the oil companies are properly charged as generators and arrangers under section 107(a)(3), 42 U.S.C. § 9607(a)(3).

In addition, it is undisputed that McAuley is the present owner of a portion of the McColl Site containing much of the hazardous waste. Moreover, McAuley is the operator of a country club with a golf course on that portion of the McColl Site. Thus, McAuley is properly charged as an owner and operator under section 107(a)(1), 42 U.S.C. § 9607(a)(1).

Thus, the Court concludes as to all Defendants there is no genuine issue regarding any of the four elements under section 107(a). However, Defendants have raised a number of defenses to the imposition of liability, and the Court now turns to those defenses not previously stricken.

## II. Section 107(b) Defenses

Defendants assert both the act of war defense under section 107(b)(2) and the acts of a third party defense under section 107(b)(3) of CERCLA. With CERCLA's basic remedial purposes in mind, the Court narrowly construes the defenses provided under section 107(b). *New York v. Shore Realty*, 759 F.2d 1032, 1048–49 (2d Cir.1985); *Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532, 1540 n. 2 (W.D.Mich.1989); *see also Pinhole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283, 286 (N.D.Cal. 1984) (contrasting "extremely limited" defenses under section 107(b) with "extremely broad" scope of liability under section 107(a)). Moreover, "in light of the 'sole cause' limitation," the defenses enumerated in section 107(b) are viewed as extremely restricted. *See* 2 The Law of Hazardous Waste: Management, Cleanup, Liability Litigation § 14.01[8][b] at 14–160.3 (Susan M. Cooke, ed.).

### A. Act of War Defense

Section 107(b)(2) of CERCLA provides an exemption from liability for an oth-erwise liable party where the defendant can establish by a preponderance of the evidence that the release was "caused solely by ... an act of war." 42 U.S.C. § 9607(b)(2). The oil companies invoke this defense on the ground the federal government's requisitioning of aviation fuel and regulation of the production of aviation fuel's production during World War II constitutes an act of war under section 107(b)(2). The oil companies do not squarely confront the formidable hurdle of the "sole cause" requirements for all section 107(b) defenses. However, the oil companies maintain they dumped the acid sludge at the McColl Site only because the government required them to produce quantities of aviation fuel so great that they had no alternative means of disposing of the waste produced by the alkylation process.

The Court has found no judicial construction of section 107(b)(2). The term "act of war" is undefined in CERCLA and, though familiar from common usage, does not disclose its parameters on its face. Nor is there any precedent clearly defining the term. Therefore, the Court looks to the structure and purpose of CERCLA, the legislative history, and a decisional law addressing the applicability of the term "act of war" in other contexts. In addition, as the term "act of war" appears to be a term of art borrowed from international law, the Court looks to sources addressing the meaning of "act of war" in that field.

Insofar as CERCLA's overall structure may shed light on the proper construction of the act of war defense, the Court notes that the provisions imposing liability under CERCLA are sweeping in their language and scope, while the provisions exempting parties from liability are narrowly drawn. Compare 42 U.S.C. § 9607(a) (imposing liability) with 42 U.S.C. § 9607(b) (providing three narrow and purportedly exclusive defenses to liability) and 42 U.S.C. § 9601(35)(A)(i) (narrow provision for "innocent landowner" defense added by SARA). This counsels against the expansive construction of "act of war" urged on the Court by the oil companies.

The legislative histories of CERCLA and SARA are devoid of any explanation of what Congress meant by its use of the term "act of war." However, the legislative histories of both CERCLA and SARA indicate beyond any doubt that CERCLA's sponsors intended the scheme of liability under CERCLA to be, in effect, one of strict liability and the defenses enumerated in section 107(b) to be narrowly construed.[3] Moreover, in amending CERCLA through SARA, Congress expressly endorsed judicial construction of section 107(a) that imposed strict liability. *See* H.Rep. No. 253, Pt. 1 at 74 (quoting with approval *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 810 (S.D.Ohio 1983)), *reprinted in* 1986 U.S.C.C.A.N. pp. 2835, 2856.

On the basis of the legislative history, and with CERCLA's overall slant in favor of imposing liability, one leading commentator has opined that the act of war defense presumes "governmental sponsorship" and "formalization of hostilities," and contemplates "a confrontation of organized forces, acts of state, massive violence, and overwhelming influence that are unlikely to be found in the domestic Superfund context." 4 William H. Rodgers, Jr., Environmental Law: Hazardous Wastes and Substances § 8.13(C)(3)(c) (1992) (pointing to "the environmental terrorism inflicted on the air and water of the Persian Gulf by the troops of Saddam Hussein" as an archetypal example). Another commentator takes the not dissimilar view that the "act of war" defense contemplates "man-made catastrophes beyond the control of any responsible party." 2 The Law of Hazardous Waste: Management, Cleanup, Liability Litigation § 14.01[8][b] at 14–160.3 (Susan M. Cooke, ed.).

As noted above, the Court has been unable to uncover any judicial precedent defining the term "act of war" either in the CERCLA context or that of environmental law generally. Even looking beyond the realm of environmental law, decisional law provides no clear authoritative definition of the term "act of war." Recent caselaw evidences a habit of merely using the term as a conclusory label. *E.g., Koohi v. United States,* 976 F.2d 1328, 1334 (9th Cir.1992) (shooting down of Iranian passenger jet by United States constituted an act of war); *Agee v. Muskie,* 629 F.2d 80, 97 n. 12, 115 (D.C.Cir.1980) (MacKinnon, J., dissenting) (seizure by Iranians of United States embassy in Tehran characterized as an act of war).

Both the governments and Defendants reach farther back, claiming support for their respective interpretations of "act of war" from the decision in *Farberwerke Vormals Meister Lucius Bruning v. Chemical Foundation, Inc.,* 283 U.S. 152, 51 S.Ct. 403, 75 L.Ed. 919 (1931). *Farberwerke* concerned the seizure during World War I of patents belonging to supporters of Germany pursuant to the Trading With the Enemy Act, 40 Stat. 411, 420, 421, 459, 460, 1020, 1021, 50 U.S.C.A. Appendix §§ 7(c), 10(f), 12. Under *Farberwerke,* it is clear that the seizure of property from supporters of an enemy nation in time of war, for the purpose of weakening that enemy, constitutes an act of war. 283 U.S. at 160–62. The Court finds little guidance in *Farberwerke,* however, regarding the applicability of the term "act of war" to the federal government's requisition of aviation fuel and close regulation of fuel production during World War II.

Fortunately, earlier decisional law provides more guidance as to the proper construction of "act of war" in this case. First, the Court notes that the seizure or capture of property belonging to or benefitting an enemy nation has been authoritatively distinguished from situations in which there is some element of contractual relationship—i.e., an express or

---

**3.** Cong.Rec.—House H11787, Dec. 3, 1980 (remarks of Rep. Florio) ("The standard of liability ... is intended to be the same as that provided in section 311 of the Federal Water Pollution Control Act; that is strict liability."), reprinted in 2 Superfund: A Legislative History 168 (Helen Cohn Needham, ed. 1984); id. at 11788 (view of Dept. of Justice expressed in letter to Rep. Florio) ("Caselaw construing section 311 clearly indicates that not only are the defenses to be narrowly construed but the plain meaning of the regime establishes a strict liability standard."), reprinted in Superfund, supra at 169; S.Rep. No. 848, 96th Cong., 2d Sess. 13, reprinted in 2 Superfund, supra at 483; H.Rep. No. 1016, 96th Cong., 2d Sess. 33, reprinted in 1980 U.S.C.C.A.N. pp. 6119, 6136; H.Rep. No. 253, Pt. 1 at 74 (SARA) ("liability under CERCLA is strict, that is, without regard to fault or willfulness").

implied agreement to compensate the owner—in the government's use or possession of property. *See, e.g., Juragua Iron Co. v. United States,* 212 U.S. 297, 308, 29 S.Ct. 385, 389, 53 L.Ed. 520 (1909) (no act of war where agreement to pay for use of property may be implied); *United States v. Winchester & Potomac River Co.,* 163 U.S. 244, 255, 16 S.Ct. 993, 997, 41 L.Ed. 145 (1896) (distinguishing seizure with no implication of compensation of railroad used for benefit of Confederacy, which constituted an "act of war," from situation where property is taken or used by federal government under an implied agreement that owner should be compensated).

In this case, of course, the federal government's procurement of aviation fuel occurred through express contracts. This undermines Defendants' effort to characterize the federal government's close regulation of the oil companies' production of aviation fuel as an "act of war."

Another helpful line of decisional law arose in the wake of the Civil War as a consequence of the court of claims' delineation of acts of war for which the federal government could not be held liable under the Bowman Act, ch. 116, 22 Stat. 485 (Mar. 3, 1883). The court consistently distinguished cases in which the government appropriated property in order to supply the military, which were compensable, from cases in which the government seized or destroyed property for the purpose of injuring or weakening the enemy. *See, e.g., White v. United States,* 33 Ct.Cl. 368, 375, 1800 WL 2081, (1898) (distinguishing between appropriation of stores and supplies for the use of the military from the "destruction of property as an act of war"); *Conard and Twenty Others v. United States,* 25 Ct.Cl. 433, 436–37, 1800 WL 1869 (1890) (taking of property properly characterized as act of war where primary purpose was not to supply the military, but rather to injure enemy); *Beasely v. United States,* 21 Ct.Cl. 225, 227, 1800 WL 1484 (1886). In this case, there can be no question but that the federal government's primary purpose in acquiring and regulating production of aviation fuel from the oil companies was to supply the military.

Lastly, the Court observes that the term "act of war," while nowhere clearly defined in American law, appears to be borrowed from international law. In the realm of international law, the term is defined clearly as a "use of force or other action by one state against another" which "[t]he state acted against recognizes ... as an act of war, either by use of retaliatory force or a declaration of war." James R. Fox, Dictionary of International and Comparative Law 6 (1992); Union Académique Internationale, Dictionnaire de la Terminologie du Droit International 12–13 (1960).

None of these guides to the proper interpretation of "act of war" as used in section 107(b)(2) of CERCLA supports the novel, expansive construction urged by Defendants. While the Court recognizes that the federal government's regulation of the production of aviation fuel during World War II was exceptionally far reaching, the Court concludes the term "act of war" as used in section 107(b)(2) of CERCLA cannot reasonably be construed to cover either the government's wartime contracts to purchase aviation fuel from the oil companies or its regulation of the oil companies' production of aviation fuel. Thus, Defendants' invocation of the act of war defense to section 107(a) liability must fail.

## B. Acts of a Third Party

The oil companies claim the United States, Japanese, and German governments are third parties who bear sole responsibility for the presence of the hazardous waste at the McColl Site. This claim must fail. "[S]ection 107(b)(3) provides a defense to liability only where a totally unrelated third party is the sole cause of the release or threatened release of a hazardous substance." *United States v. Stringfellow,* 661 F.Supp. 1053, 1061 (C.D.Cal.1987).

As noted above the oil companies entered into volitional contracts with the United States for the sale of aviation fuel. It was within the context of this contractual relationship with the United States that the oil companies arranged to have the waste disposed of at the McColl Site. Section 107(b)(3) expressly precludes invocation of the third party defense in such a scenario.

Therefore, Defendants' endeavor to invoke the third party defense under CERCLA section 107(b)(3) must fail as a matter of law.

### III. Innocent Landowner Defense

 Although undeniably the present owner of part of the McColl Site, McAuley attempts to assert the so-called "innocent landowner" defense under section 101(35) of CERCLA.

Originally, CERCLA imposed strict liability on all owners of contaminated property regardless of the circumstances of their ownership. This aspect of section 107(a) became controversial as a result of several cases in which apparently "innocent" landowners were held liable for response costs greatly in excess of the value of the land. *E.g., United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573 (D.Md.1986). In response to this controversy, Congress introduced a so-called "innocent landowner" defense to liability in SARA. Congress created this new exception by modifying the definition of "contractual relationship" in section 101(35), 42 U.S.C. § 9601(35). Amended section 101(35) excepts from the term "contractual relationship" a landowner defendant who shows by a preponderance of the evidence that "[a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility." 42 U.S.C. § 9601(35)(A)(i).

Congress was careful, however, to ensure that the innocent landowner exception is narrow. Thus, section 101(35)(B) requires: "To establish that the defendant had no reason to know ..., the defendant must have undertaken, at the time of acquisition, all appropriate inquiry into the previous ownership and uses of the property consistent with good commercial or customary practice in an effort to minimize liability." 42 U.S.C. § 9601(35)(B). Furthermore, in evaluating whether a defendant has fulfilled this requirement, the Court is directed to "take into account any specialized knowledge or experience on the part of the defendant, the relationship of the purchase price to the value of the property if uncontaminated, commonly

known or reasonably ascertainable information about the property, the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection." *Id.*

In order to establish its entitlement to exemption from liability under the innocent landowner exception, McAuley must establish the following four elements:

(1) "[a]t the time [McAuley] acquired the facility [McAuley] did not know and had no reason to know" that the property was contaminated, 42 U.S.C.A. § 9601(35)(A)(i);

(2) no hazardous substances were disposed of on the property during McAuley's ownership of the site, 42 U.S.C. § 9601(35)(A);

(3) McAuley exercised "due care with respect to the hazardous substances" once it acquired the property, 42 U.S.C. § 9607(b)(3)(a); and

(4) McAuley "by any act or omission, [did not] cause[ ] or contribute[ ] to the release or threat [of] release of a[ny] hazardous substance" on the site, 42 U.S.C. § 9601(35)(D).

 Consistent with the general rule that defenses to CERCLA are narrowly construed, these criteria are strictly construed and failure to carry its burden with regard to any one of them will defeat a defendant's attempt to assert the innocent landowner defense. *CPC International, Inc. v. Aerojet–General Corp.*, 777 F.Supp. 549, 581 (W.D.Mich.1991); *Washington v. Time Oil Co.*, 687 F.Supp. 529, 531 (W.D.Wash.1988).

Here, there is overwhelming evidence that not only did McAuley have ample reason to know of the presence of hazardous wastes at the country club, it had actual knowledge of that fact prior to its purchase of the club. The only "evidence" to the contrary is the bald assertion in Mr. McAuley's declaration that he did not know and had no reason to know that there was hazardous waste at the McColl Site. This declaration is patently incredible, as McAuley commissioned an environmental assessment of the Site in 1980. Moreover, prior to making this declaration, Mr. McAuley testified at his deposition that he either had no recollection concerning the

environmental assessment he commissioned or was not present during the fall of 1980. Pursuant to *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975), Mr. McAuley's subsequent contradictory declaration is entitled to no consideration.

Because McAuley fails to satisfy the exacting standard set forth in section 101(35)(B), 42 U.S.C. § 9601(35)(B), it fails completely to establish any genuine issue as to the first element of the innocent landowner defense. Thus, the Court concludes that McAuley's invocation of the innocent landowner defense must fail.

### III. Assaults on the Constitutionality of CERCLA

Defendants attack the application of CERCLA section 107(a) in this case as violative of both the Due Process Clause and the Takings Clause of the Fifth Amendment. Neither of these claims has merit.

#### A. Retroactive Application of CERCLA

■ The oil companies argue that retroactive application of CERCLA in this case would violate the Due Process Clause of the Fifth Amendment. The Court disagrees. Retroactive application of CERCLA has uniformly been held not to violate the Due Process Clause. *E.g., United States v. Monsanto Co.*, 858 F.2d 160, 174 (4th Cir.1988); *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 732–34 (8th Cir.1986), *cert. denied* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *United States v. Atlas Minerals & Chemicals, Inc.*, 797 F.Supp. 411 (E.D.Pa.1992); *United States v. Dickerson*, 640 F.Supp. 448, 451 (D.Md.1986) ("The courts have consistently ruled that CERCLA's language and legislative history overrule the presumption against retroactive application of statutes, and have rejected similar constitutional attacks upon the Act.").

The Court finds no basis on which to distinguish this case from the broad spectrum of others in which retroactive application of CERCLA has been upheld. Indeed, much of the decisional law regarding CERCLA involves the disposal of hazardous wastes that occurred decades before the statute was enacted. Both CERCLA's language and legislative history reveal Congress' conscious intent to compel correction of the careless disposal of hazardous waste in the past by the nation's industries. *NEPACCO*, 810 F.2d at 732–33 (noting past tense of § 107's language referring to actions and conditions); *United States v. Kramer*, 757 F.Supp. 397, 430 (D.N.J.1991).

Therefore, the Court concludes retroactive application of CERCLA in this case does not violate the Due Process Clause of the Fifth Amendment.

#### B. Application of CERCLA as an Unconstitutional Taking

■ Defendants contend imposition of section 107(a) liability in this case constitutes an unconstitutional taking. This attack on government cost recovery actions under section 107 has been raised and rejected by courts. *E.g., NEPACCO*, 810 F.2d 726, 734 (8th Cir.1986). CERCLA, as amended by SARA, clearly provides a mechanism by which parties held liable for response costs under section 107(a) may allocate those costs among themselves through contribution suits under section 113(f), codified as amended at 42 U.S.C. § 9613(f). *Chemical Waste Management, Inc. v. Armstrong World Industries, Inc.*, 669 F.Supp. 1285, 1295 (E.D.Pa. 1987).

In view of the statutorily provided right of contribution, CERCLA's provision for allocating liability for the cleanup of public hazards cannot fairly be characterized as a taking at all. Thus, the Court concludes that the imposition of section 107 liability on the defendants in this action does not constitute an unconstitutional taking.

### IV. Bifurcation of Defendants' Counterclaims and Cross–Claims

■ Federal Rule of Civil Procedure 42(b) authorizes the Court to order a separate trial of any claim including counterclaims, cross-claims, or any other issue for purposes of convenience, avoiding prejudice, expedition, or judicial economy. The principal goal of Rule 42(b) is to promote efficient judicial administration, and only one of the

conditions set forth in the rule need be served to justify a separate trial.

Under CERCLA, the governments may recover response costs that are necessary and consistent with the National Contingency Plan ("NCP"). 42 U.S.C. § 9607(a)(4)(B). Thus, all that remains to the cost recovery phase of this litigation is the Court's determination whether the governments' response costs are consistent with the NCP.

Defendants assert numerous counterclaims against the United States, including several which assert that the United States is liable under § 107 of CERCLA due to the alleged control the United States exercised over the petroleum industry during World War II. The oil companies also seek recovery of $12 million in response costs they claim to have incurred in connection with the contamination of the McColl Site. In addition, Defendants have filed cross-claims against each other.

The bringing of such claims and actions in pursuit of contribution is expressly provided for in section 113(f) of CERCLA. 42 U.S.C. § 9613(f). The purpose of section 113(f) is to mitigate the harshness of section 107 by providing for an eventual equitable sharing of costs among responsible parties. However, it was not intended and the Court will not allow it to be used as a tool to delay the securing of CERCLA's benefits to society.

CERCLA clearly provides that cost recovery can be sought before any counterclaims are resolved. And the legislative history of CERCLA indicates that Congress intended for the government to be entitled to recover its costs prior to the resolution of any counterclaims or cross-claims for contribution. ("The Government should obtain the full costs of cleanup from those it targets for enforcement, and leave remaining costs to be recovered in private contribution actions".) *E.g.*, 132 Cong.Rec. S14,903 (daily ed. Oct. 3, 1986).

The possibility of a future finding of partial liability on the part of the governments ought not stand as a bar to expeditious recovery of response costs, as Defendants will be reimbursed in the event the governments are found liable. *U.S. v. Western Processing Company*, 734 F.Supp. 930, 939–40 (W.D.Wash.1990). The Court is of the opinion that allowing the governments to recover their response costs before resolving Defendants' counterclaims and cross-claims will not unduly prejudice Defendants as they will be reimbursed in the future for any costs paid to the Superfund that are properly attributable to other parties. In contrast, the Court takes the view that litigating the cost recovery together with the cross and counterclaim aspects of the action would inappropriately prejudice the public welfare by slowing replenishment of the Superfund.

Therefore, the Court concludes that bifurcation of Defendants' counterclaims and cross-claims from the remaining portion of the cost recovery phase of this litigation will best serve the Court's and litigants' economy of time and effort.

## CONCLUSION

Wherefore, the Court hereby ORDERS:

1. Because the oil companies have failed to raise any genuine issue of material fact as to their liability, summary judgment as to the liability of the oil companies under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), is GRANTED in favor of Plaintiffs United States of America and the State of California and against Defendants Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, and Texaco, Inc.; and

2. Because McAuley has failed to raise any genuine issue of material fact as to its liability under 42 U.S.C. § 9607(a), the governments' motion for summary judgment as to liability of McAuley is GRANTED in favor of Plaintiffs United States of America and the State of California and against McAuley LCX Corporation; and

3. Having granted summary judgment against all remaining defendants as to liability under section 107(a) and finding the purposes of CERCLA best served by separating the remaining aspects of the cost recovery phase of the action from Defendants' numerous counterclaims and cross-claims for contribution, the Court ORDERS Defendants' counterclaims and cross-claims bifurcated

from the remainder of the cost recovery phase; and

4. Litigation of Defendants' counterclaims and cross-claims for contribution is stayed pending completion of the governments' cost recovery phase of this action.

The Clerk shall send, by United States mail, copies of this Memorandum of Decision and Order to all parties to this action.

IT IS SO ORDERED.

## JUDGMENT

For the reasons set forth in the Memorandum and Decision and Order filed contemporaneously herewith,

IT IS HEREBY ORDERED AND ADJUDGED:

Judgment shall be entered in favor of Plaintiffs United States of America and the State of California and against Defendants Shell Oil Company, Union Oil Company of California, Atlantic Richfield Company, Texaco, Inc., and McAuley LCX Corporation on the issue of liability under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9607(a).

The Clerk shall send, by United States mail, copies of this Judgment to all parties to this action.